IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH GILLAM and JESSICA : 
GILLAM, :
        Plaintiffs :
    v. : Civil Action No. 04-15J
STATE FARM MUTUAL AUTOMOBILE :
INSURANCE COMPANY, :
        Defendant. :

## Report and Recommendation

Recommendation

      Pending is defendant's motion for summary judgment. docket no. 15. I recommend that it be granted.

Report

      Plaintiffs Kenneth Gillam and Jessica Gillam seek a declaratory judgment that their 2002 insurance policy with defendant State Farm Mutual Automobile Insurance Company provides underinsured motorists coverage (UIM) in an amount equal to their bodily injury liability limits under the policy, $100,000.00 per person and $300,000.00 per accident, stacked for the two vehicles the Gillams had insured. Kenneth Gillam was injured in an automobile accident in the course of his employment on January 24, 2002. After plaintiffs settled their liability claim against the other driver, State Farm paid plaintiffs $30,000.00, maintaining that their UIM coverage was $15,000.00 per person and $30,000.00 per accident, stacked for the two vehicles the Gillams had insured. State Farm's payment was without prejudice to adjudicating the amount of coverage in this action.

      The disputed issue in this case is how to interpret a

contract when the parties have, objectively speaking, manifested assent to terms of a contract but, subjectively speaking, never had a meeting of the minds because one party to the contract did not understand the terms proposed. Under Pennsylvania law, that unilateral mistake can result in reformation of the contract only where the other party had such knowledge of the mistake as to justify an inference of fraud. <u>Employers Fire Ins. Co. v. Alvarado</u>, 2005 WL 182717, *5 (E.D.Pa.2005)(Diamond, J., of this court, sitting by assignment).

Initially, plaintiffs note that defendant did not comply with Local Rule 56.1(B)(1) by filing a separate concise statement of material facts consisting of numbered paragraphs supported by citations to the record. If it were not possible to follow the defendant's argument or make reply, that would be grounds for denying the motion, but because plaintiffs have not been hampered in responding by this technical breach and it is obvious that counsel for both sides have presented their arguments fully, no further development of the record is needed.

I

In July of 1998, Kenneth Gillam was living in Altoona and applied for automobile insurance from State Farm through the Lewistown office of State Farm agent Robert T. Richard. Gillam's father lived in Lewistown, and up to that time Gillam's coverage had been under his father's policy. docket no. 16, Exhibit B,

Gillam deposition at 4-5. Gillam never spoke with anyone from State Farm in the course of applying for the policy, either to select limits of coverage or to have the policy terms explained. Gillam depo. at 7, 9. Richard likewise does not recall speaking with Gillam directly, nor does he recall any member of his staff doing so. docket no. 17, Exhibit 2, Richard deposition at 15, 19, 25-27, 29, 88. Gillam asked his father to obtain insurance for him, and specifically asked his father to "[g]et me the insurance he has. He has good insurance, and I just wanted what he has because that's just the way my whole family is like that," Gillam depo. at 7, because "I wanted what the old man wanted, my father." id. at 31. Gillam admitted that in 1998, he did not know exactly what insurance his father had, id. at 27, see also id. at 13, had "no idea" what he himself wanted, id. at 31, and was not clear on difference between per person and per accident limits, id. at 30, or even on the purpose of underinsured motorists coverage. id. at 30: "Up until all this I thought insurance was basically for the other guy."

Richard stated that his activity logs indicated that Gillam's father called the State Farm office on July 1, 1998, and his employee Theresa Shawver spoke to him and gave him a quote on a policy for Kenneth Gillam. Richard depo. at 19, 21, 25-27, 29, 91 & deposition Exhibit C. The next day, Denise Coldren, another assistant in the office, filled out an application, which was then

3

signed by Richard.  id. at 21, 26 & deposition Exhibit A.

Richard gave the application to Gillam's father, who brought it to Gillam for his signature.  Gillam depo. at 8.  Gillam initialed next to the boxes that were filled in on the application because his father told him to do so.  id. at 11.  The boxes indicated that he was electing UIM in the amount of "15/30," that is, $15,000.00 per person and $30,000.00 per accident, for a premium of $10.20.  The same election was made with respect to uninsured motorists benefits (UM), for a premium of $6.20.  The boxes labeled "stacking" were checked for both UM and UIM.  id. at deposition Exhibit A.

Gillam also signed the portion of the second page of the application entitled "Important Notice," but he did not read it.  id. at 12.  He stated that he did not understand what it meant, but he did not ask Agent Richard, or his father, to explain the terms to him.  id. at 22-25, 43-44.

Between 1998 and 2002, Kenneth Gillam married Jessica Gillam.  Between 1998 and 2002, as they bought new vehicles and replaced old ones, the Gillams did not change the coverage limits Kenneth Gillam had purchased in 1998.  He received annual declarations pages from State Farm that spelled out the amount of coverage he had, see e.g. Complaint Exhibit 2, but he did not read them.  Gillam depo. at 16.

In sum, Gillam did not know what kind of coverage his

father had, but he believed it was good coverage and he wanted the same for himself. <u>id.</u> at 27-28. He did not ask to have UM or UIM coverage reduced, because he did not really understand what those coverages were. If the choices been explained to him, Gillam believes he would have bought UIM at $100,000.00 coverage, to match his liability limits. <u>id.</u> at 34. He points to no affirmative misstatement by State Farm, but:

> I believe they failed in telling me the difference. I've never been in a financial bind. I've worked hard my entire life. Four dollars, four or five dollars, difference between 15,000 or 300,000, come on, man. I'm highly insured. I pay top dollar for insurance. Had I known I was getting 15/30 on this paper, I wouldn't have signed my name on that. I was under the impression this is what I was getting 100 and 300,000. In my opinion, I feel that they didn't mislead me, but they misinformed me. They didn't tell me. Gillam depo. at 19.

II

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. <u>Woodside v. School Dist. of Philadelphia Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001) (internal quotations and citations omitted). The court must construe the facts in the light most favorable to the non-moving party. <u>Doe v. Centre County</u>, 242 F.3d 437, 446 (3d Cir. 2001).

Since plaintiff's bear the burden of proving their selection of 15/30 UIM limits is not conclusive of the coverage

owed them by State Farm, State Farm may present a <u>prima</u> <u>facie</u> case for summary judgment by "pointing out to the District Court [] that there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The Gillams are then required to "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986): they must show that a reasonable factfinder might, following the applicable substantive law, return a verdict for them. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

### III

Under the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.§§ 1701-99 (MVFRL), insurers are required to offer both UM and UIM coverage at the time of the initial application for a policy. 75 Pa.C.S.§ 1731(a). The MVFRL allows applicants to reject these coverages entirely, <u>id.</u> at §1731(b)(UM coverage) and 1731(c)(UIM coverage). The following language must be used to reject UIM coverage:

REJECTION OF UNDERINSURED MOTORIST PROTECTION

By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

.........................................
                  Signature of First Named Insured

..........................................
                                        Date

75 Pa.C.S.§ 1731(c).

To be valid, a UIM rejection form must comply with the requirements of §1731(c.1), that is, it must be: 1) on a separate piece of paper from any UM rejection; 2) signed by the first named insured; and 3) dated. See Winslow-Quattlebaum v. Maryland Ins. Group, 752 A.2d 878, 882 (Pa. 2000).

Insurers are also required to advise applicants for insurance that they can purchase UM and UIM coverage up to $100,000 per person and $300,000 per accident. 75 Pa.C.S.§ 1791. That advice must be given in writing with the heading "Important Notice" and the notice must contain the language:

Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected.

Kenneth Gillam's admittedly received and signed the portion of the policy application containing the language required by Section 1791 to be in the "Important Notice," including the language quoted above, and the Gillams paid renewal premiums after 1998. Kenneth Gillam's signature on the insurance application and his initials in the relevant portions of the UM and UIM coverage provisions are almost conclusive evidence that he did elect 15/30 UM and UIM coverage under Section 1734. See Young v. State Farm Mutual Automobile Insurance Co. 54 Fed.Appx 365, 367 (3d Cir.2002).

7

In <u>Lewis v. Erie Insurance Exchange</u>, 793 A.2d 143 (Pa.2002), the Pennsylvania Supreme Court specifically held that the technical requirements of §1731(c.1) apply only when an insurer seeks to enforce complete rejections of UM/UIM coverage, not when an insured has requested a specific limit for UM/UIM coverage. Requests for specific limits of coverage are governed by §1734, which states only:

A named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury.

In <u>State Farm Mutual Automobile Insurance Co. v. Ciccarella</u>, 2002 WL 827138 (E.D. Pa. May 1, 2002), a case which is not binding precedent but which the circuit found, in <u>Young</u>, <u>supra</u>, to be well-reasoned, the district court relied on <u>Lewis</u> to conclude that, when the box labeled "other" was checked, with limits of $15,000.00 per person and $30,000.00 per accident written in and with the initials of the insureds next to it, and when the insureds signed a section of the application captioned "Important Notice" which specified the available amounts and limits of coverage including UIM, these acts were sufficient to satisfy the "written request" requirement of § 1734. <u>Ciccarella</u> rejected the insureds' proposed inquiry into whether their election of lower UIM benefits was "knowing and intelligent," because compliance with the MVFRL was itself sufficient.

Except for the application's use of the abbreviation "15/30" for $15,000/$30,000, the policy application in this case is indistinguishable from that considered in Ciccarella. Plaintiffs argue that even if Ciccarella were persuasive, this distinction is crucial (although it was not in Young), since Richard himself stated that notations like "15/30" on an application would have to be explained to an insured, who would not be expected to know what the numbers meant. Richard depo. at 84-85. However, the basis for the decision in Ciccarella was that the initials of the insured, in combination with the signature in the "Important Notice" section, were sufficient to meet the requirement of §1734 for a written request, not that they showed request was knowing and intelligent. That conclusion applies equally to the facts of this case.

Moreover, Gillam has stated that he signed and initialed the UM and UIM portions of the application because that was where his father told him he needed to sign, Gillam depo. at 11-13, not because he read it and misunderstood what "15/30" meant or because that term was ambiguous. (In context, the term "15/30" is not ambiguous, but if it were the ambiguity could not possibly help Gillam, since if "15/30" were capable of being construed as an ambiguous reference either to "$15 and $30" or to "$15,000 and $30,000," State Farm is already interpreting the ambiguity in favor of Gillam. This argument is a makeweight, since the abbreviations

9

"15/30" are parallel to the abbreviations "100/300" in the policy application, and there is no contention that Gillam misunderstood that these were shorthand for $100,000 and $300,000.)  In fact, the evidence of the only person which direct knowledge of Gillam's state of mind, Gillam himself, is that he believed his father had good coverage and that he was relying on his father to select the same coverage for Gillam that Gillam's father had for himself, without any knowledge of his specific limits or even knowledge of the purpose of UIM coverage.  Even where the UIM coverage limits were fully spelled out as "$15,000.00/$30,000.00," for instance in the 2002 declarations page attached to the complaint, Gillam stated that he did not read them.

Plaintiffs argue that Gillam's elections were not "knowing and voluntary."  A reasonable factfinder could find that to be the case, even given the repeated opportunities Gillam had for informing himself about and changing his coverage.  However, Pennsylvania law does not require a request for reduced limits of UIM coverage to be knowing and voluntary, and as the Pennsylvania Supreme Court stated in <u>Lewis</u>, once the notice provided by Section 1791 is provided, knowledge of the benefits provided is presumed and "no other notice or rejection shall be required."  793 A.2d 753-54.  <u>Ciccarella</u> similarly observes that an inquiry into the knowledge or voluntariness of the insured "is unnecessary when the insurer has complied with the MVFRL." 2002 WL 827138, at *3.  <u>See</u>

10

also <u>Nationwide Mut. Ins. Co. v. Heintz</u>, 804 A.2d 1209, 1219 (Pa. Super.2002) (Even where an insurer failed to provide Section 1791 notice, a voluntariness inquiry is inappropriate to determine whether there was an election of lower limits under Section 1734.), <u>appeal denied</u>, 818 A.2d 505 (Pa. 2003); <u>Kline v. Old Guard Ins. Co.</u>, 820 A.2d 783, 787 (Pa. Super.2003) ("[T]his court acknowledged in <u>Heintz</u> that we may no longer participate in an analysis of whether the insured had 'knowingly and intelligently' waived UIM protection, even where the parties had stipulated that the insured had not received the Important Notice mandated by section 1791.")

Gillam could convince a reasonable factfinder that there was a failure to educate him about what he was purchasing, but he does not show that there are any disputed facts that might allow a conclusion that he was misled into making his UIM coverage election. The Pennsylvania Supreme Court holds that, "[i]n the absence of proof of fraud, failure to read [a contract] is unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof." <u>Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.</u>, 517 A.2d 910, 913 (Pa.1986) (citations omitted). <u>See</u> <u>also</u> <u>Kline</u>, 820 A.2d at 787 (rejecting argument by insureds that they could avoid the presumption of knowledge under Section 1791 by contending that they did not read or understand the "Important Notice" section of application).

11

Plaintiffs attempt to prove that State Farm committed fraud by evidence that Richard did not follow State Farm procedures or his office practice in connection with this application. For example, they note that Richard has a form, not used in this case, with which insureds can expressly reduce UM and UIM coverage. Richard depo. Exhibit D. However, Richard stated without contradiction that this form is used to change existing coverage, while in new applications the form itself contains the relevant information. Richard depo. at 79-83. Plaintiffs also note that Richard conceded that the practice in his office is to recommend that UM and UIM coverage match the bodily injury coverage on the policy, that his office explains these items to the client, and that it is a practice in his office and requirement of State Farm that applications be signed by the client in person so that coverage choices can be explained. id. at 32-37, 41-43, 84-85, 97, 100. It is not in dispute that Richard cannot explain how Gillam ended up with the coverages that were selected. However, that is not evidence that Gillam was misled.

Under Pennsylvania law, to establish a cause of action for fraud, a plaintiff must demonstrate the following elements by clear and convincing evidence:

(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

12

Bortz v. Noon, 729 A.2d 555 (Pa. 1999) (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)). Silence where there is a duty to speak can constitute a representation just as a positive statement can. Frowen v. Blank, 425 A.2d 412, 415 (Pa.1981).

Since Gillam never spoke with anyone from State Farm, if Richard had a duty to explain the nature of UIM coverage to him, his failure to do so could be found to be negligence. This is short of fraud, since plaintiffs produce no evidence to show how this failure to say anything constitutes the hypothetical specific representation by Richard that "your coverage is 100/300 and coverage is coverage," or that this hypothetical representation was relied on by Kenneth Gillam. But this line of attack fails at the outset because Pennsylvania does specify what duty an agent has to advise the consumer of UIM coverage provisions: it is set forth in Section 1791, and there is no dispute that State Farm complied with Section 1791.

Finally, I must point out that there is no evidence whatsoever to support the argument scattered throughout plaintiffs' brief, see docket no. 17 Plaintiffs' Brief at 12, 16, 17, that a jury could find fraud because insurers in general have an "abusive practice" of foisting off lower levels of coverage on insureds to gain some illicit benefit, and that this calls for heightening the waive down requirements beyond the minimal requirements of Section 1734. As counsel must know, the prices of goods and services,

whether carrots or insurance policies, are set to cover costs and return some margin of profit. Except in monopolized markets, what keeps that margin of profit in check is the potential for losing customers to other merchants offering the same product for lower prices. Since an automobile insurer is not in business to lose money, unless it irrationally applies different actuarial methods to the same risk factors, it would ordinarily want all of its insured to have as high UM or UIM coverage as it can without driving customers away, because higher coverages mean higher premiums. Steering an insured to select lower limits, which is what plaintiffs counsel accuses defendant of doing, would in every imaginable circumstances be contrary to the insurer's perceived self interest, since if an insurer believes it has competently assessed the cost of insuring its clients, it would believe that it benefits by writing as much business as possible. I cannot say an insurer couldn't act irrationally, but as the Supreme Court said almost two decades ago, the absence of any plausible motive to engage in the conduct alleged by plaintiffs is relevant to whether a genuine issue of fact exists within the meaning of Rule 56(e). <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475 U.S. at 596-97.

In sum, the Pennsylvania legislature regulates the relative duties of insured and insurer in detail, and in the MVFRL has chosen to set (in Section 1731) relatively stringent

14

requirements for rejecting UIM coverage but (in Section 1734) relatively modest requirements for selecting particular levels of UIM coverage. Those requirements were obeyed by defendant. A sympathetic court cannot change those rules after the fact by finding an issue of fact for the jury where there is none. Judgment must be entered for the defendant.

Pursuant to 28 U.S.C. § 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 7 September 2005

Keith A. Pesto
United States Magistrate Judge

cc:
Michael H. Rosenzweig, Esq.
707 Grant Street
Gulf Tower, 16th Floor
Pittsburgh, PA 15219-1925

Daniel L. Rivetti, Esq.
Dennis St. John Mulvihill, Esq.
2300 One Mellon Center
Pittsburgh, PA 15219